UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

              v.                                   19-CR-7 (WMS)

SACHIN AJI BHASKAR,

              Defendant.
_____

## SENTENCING MEMORANDUM AND REQUEST FOR A NON-GUIDELINES SENTENCE

### INTRODUCTION

This Sentencing Memorandum is submitted on behalf of Sachin Aji Bhaskar, the defendant in the above captioned matter.  For the reasons stated herein, we respectfully ask the Court to sentence Mr. Bhaskar to the statutory mandatory minimum term of 120 months' imprisonment.

### RELEVANT PROCEDURAL HISTORY

On March 5, 2020, Mr. Bhaskar entered into an open guilty plea to the sole count in the Indictment charging him with using a means of interstate commerce in order to knowingly persuade an individual, who has not attained the age of 18 years, to engage in unlawful sexual activity in violation of 18 U.S.C. §2422(b).  The statute requires imposition of a prison sentence of not less than 10 years.

## **GROUNDS FOR IMPOSITION OF A NON-GUIDELINES SENTENCE**

**1.     The History and Characteristics of the Defendant [18 U.S.C. §3553 (a)(1)]**

Sachin Bhaskar is a 24-year-old young man with no prior criminal convictions. At the time of the incident at bar, he was 22 years of age.  Mr. Bhaskar recognizes that his actions were extremely serious and he has accepted full responsibility, as indicated by his guilty plea, and asks this Court to consider, among other factors, his personal background and characteristics in determining an appropriate sentence.

Mr. Bhaskar's offense conduct is not reflective of the decent individual that is his true nature.  Under 18 U.S.C. §3661, "***no limitation*** shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" (*emphasis added*).

This statutory language certainly overrides the (now-advisory) policy statements in Part H of the sentencing guidelines, which lists as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and  emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. *See* U.S.S.G. §5H1.

Judge Rakoff of the Southern District of New York said,

> [S]urely if every man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed the Courts to consider, as a necessary

> sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F.Supp. 2d 506, 513-14 (S.D.N.Y. 2006).  Mr. Bhaskar should be judged on the whole of his life, not just the incredibly poor decisions he made in this case.  As set forth below and demonstrated by numerous letters submitted on Mr. Bhaskar's behalf, Mr. Bhaskar has an accomplished background, comprised of personal achievements, academic successes, and significant family ties.  Described below are the pertinent characteristics and lifelong history that Mr. Bhaskar asks the Court to consider when determining an appropriate sentence.

**(1) Sachin Bhaskar is the Younger of Two Sons, Born and Raised in Oman by his Parents, and Has Had the Support of His Family Throughout the Entirety of This Case.**

Sachin Bhaskar was born on July 29, 1996 in Thiruvananthapuram, Kerala, India, and moved to Oman when he was two months old.  Growing up in Oman, he lived with his mother, Suchitra, his father, Aji, 58 and older brother, Nitin, age 29.  His father worked as the Director of IT at the National Bank of Oman and his mother was a homemaker.  Sachin had a very strict Hindu upbringing, which included attending a Hindu temple every Friday and an extreme emphasis on academics and discipline.

As children, both Sachin and Nitin endured abuse at the hands of their father.  For example, if Sachin misbehaved or arrived home later than expected, his father resorted to physical abuse as a means of discipline, sometimes using bamboo sticks, belts, or a cane.  This continued up until he entered the 7th grade, wherein he occasionally endured bruising throughout his body as a result.  The pain and stress took

a toll on Sachin, who had always been quite small for his age.  He began to find it impossible to sleep and experienced high levels of anxiety and stress.[1]

In addition to the personal abuse he endured, Sachin also witnessed his father's aggression towards his mother on a couple of occasions, recalling times when his father was physically violent towards his mother.  As a teenager, Sachin had the unenviable task of consoling his mother after his father's outburst.

Of note, while Nitin also acknowledges the abuse at the hands of his father, he describes growing up in a culture in Oman where his father's behavior towards his children and wife were normal and accepted, while recognizing that such behavior is considered criminal here in the United States.[2]

When Sachin was about 10 years old, Nitin left home to attend boarding school, then later college and graduate school, returning home only during the summer months.  Mr. Bhaskar, who had been extremely close to his brother, felt abandoned and alone.  Further, Nitin leaving home meant that the father's temper would be more focused on Sachin, as there would be nobody there to buffer the aggression.

Despite those feelings as a child, when Nitin moved to the United States to pursue a master's degree, Sachin applied and was accepted to college in the states, hoping to be closer to his brother and build on their relationship.  Further, his parents also felt that the bond between the two was an important one and urged Sachin to pursue his education in the states.

---

[1] In addition to stressors in his home environment, Sachin also was sexually abused by a stranger during the seventh grade, which further contributed to his mental health issues, and will be further explored later in this memorandum.

[2] Nitin does, however, acknowledge that the culture back home has changed since both Sachin and his brother were growing up, and such behavior would now be viewed as domestic abuse.

To this day, despite Sachin's present circumstances, he has maintained and fostered a very close relationship with both Nitin and Nitin's wife, Malavika, who live together in Buffalo, New York.  Nitin is an Operations Program Manager at *Calspan* where he has worked for the last six years.  Prior to working there, he earned a Master's Degree in electrical engineering from Rochester Institute of Technology, as well as a Bachelor's Degree in electronics and communication engineering in India.  Malavika is also pursuing higher education after earning a Bachelor's Degree in Urban Planning in India, as she is currently enrolled in a full-time graduate program at Ohio State University.  She is studying for her Master's in finance, as well as working as a graduate assistant at the university.  Both Nitin and Malavika have been present during each court proceeding, have visited Sachin at the facility where he is housed (pre-coronavirus when visits were still permitted), and now regularly do video calls and regular phone calls with Mr. Bhaskar.

Similarly, as Sachin's parents do not live in the United States, they speak with him both on the phone and through video calls, numerous times during the week, and have been a consistent source of support throughout the entirety of this case.  Despite difficulties in his upbringing regarding the level of extreme discipline he faced, Sachin nonetheless remains exceptionally close to both parents, including his father, and considers both to be extremely loving and supportive, particularly throughout this difficult time.

Thus, not only would Mr. Bhaskar have a strong familial system while serving his sentence, but once released, he will return home to a family that has been determined to help in any way they can throughout this process.

**(2) Sachin Bhaskar Has Always Been an Exceptional Student, Earning Top Honors Throughout His Academic Career.  However, Despite Academic Success, Sachin Experienced a Level of Culture Shock While Enrolled in College in the United States.**

Growing up in Oman, Mr. Bhaskar was always a bright and successful student. Throughout his lower school education, he participated in a number of sports clubs, including volleyball, badminton, ping pong, soccer, and swimming.  However, once he entered the eighth grade, his parents made the decision that there was only time for one sporting activity, so that he could better focus on academics.  Sachin thereafter chose to play soccer, which he did through the 12th grade.  While in high school at *Indian School Muscat*, he committed himself to the sport and even earned a spot as the team captain in his senior year.  Additionally, Sachin was a member of the *Morison Muscat Toastmasters Club* for approximately one year after high school, which was an academic club that focused on developing communication, writing, and leadership skills through various forms of speech writing and public speaking.  As a student seemingly emerged in a variety of activities, Sachin nonetheless continued to struggle in terms of the insecurities he felt around his peers and had a notably difficult time maintaining normal social circles outside of these extracurricular activities.  In 2014, he graduated from high school with a focus on engineering design and was awarded an academic achievement award in Engineering Graphics.  (Transcripts and other documents describing Sachin's pre-college education are included in the Exhibits to this Memorandum).

After graduation, he sought a college education in the United States.  Though most students in Oman, at the conclusion of their education, will pursue a bachelor's degree in India, both Sachin and his parents wanted Sachin and Nitin to strengthen their relationship, as there was minimal contact over the years due to the long distance.

Upon being accepted into *Penn State University*, and receiving an F-1 visa, he began in the fall semester of 2014 at the main campus and studied mechanical engineering.  (A copy of Sachin's student visa, as well as awards, achievements, letter of recommendation and transcript, from *Penn State*, are included in the Exhibits to this Memorandum).

Initially, Sachin had a difficult time adjusting to the starkly different social dynamics presented by an American university in comparison to that of which he was accustomed to in Oman.   Further, the campus of *Penn State* was a world of its own. Though Sachin was now, at least, in the same country as his brother, he was nonetheless hours away from Buffalo (where Nitin lived) and insulated in his own world within the campus.[3] To deal with the social anxieties that emerged in this new environment, Mr. Bhaskar immersed himself in a number of different student clubs and organizations, hoping to meet other students and build his resume.  For a full year, he served as the president of the *Penn State Pingers Toastmasters Club*, where he oversaw student activities within the club and delegated responsibilities to other members.  Mr. Bhaskar was also selected as a trainee for *Nittany Consulting Group*.  After applying with over 150 other students, he was chosen to participate in the program, which focused on preparing students for post-graduation careers in the consulting industry.  Mr. Bhaskar was also on the Alumni Committee for *THON*, a student-run service organization dedicated to raising funds and spreading awareness for children suffering from cancer and their families.  As the education liaison, Mr. Bhaskar was in charge of educating the community about the organization and seeking donations from the university's alumni

---

[3] One of the larger universities in the United States, the main campus where Sachin lived has an approximate undergraduate population of 40,000 students.

community.  One of his favorite memories was the school's 48-hour Dance-A-Thon which was one of the organization's most successful fundraising efforts.

Additionally, Sachin was a team volunteer with the university's *Advanced Vehicle Team*. As a volunteer, he worked in the systems safety department and performed various tasks, including creating hazard operability analysis, testing safety requirements for the electronic motor, and a number of other safety-related tasks. Sachin also participated in numerous programs within the *School of Engineering Design, Technology and Professional Programs*. During one semester, he was a CAD lab assistant, where he assisted the professor in analyzing and grading CAD homework of other students, as well as assisted the students in design projects assigned by *Lockheed Martin*. Also, within the same program, he was a team member of *Brakes and Aerodynamics Subsystem*, where he worked on design and engineering projects, further enhancing his knowledge in the field.

Sachin was also a member of the *Phi Eta Sigma Honor Society*, wherein he earned membership by maintaining a 3.7 GPA.  In addition to various academic activities, the group was heavily involved in community service within the local community, most notably with the local nursing homes, which Sachin visited every two weeks.  When talking about his experience, he describes feeling surprised at first as he had never before been in a nursing home in Oman.  After only a few times visiting, he developed relationships with many of the residents, who he regularly sat with for hours at a time, listening to stories about their past lives and creating new friendships with them. In addition to this honor society, Sachin joined another student group that celebrated American festivals and holidays, though Sachin recalls the irony of the group, in that the

majority of its members were international students.  It was through this group that Sachin celebrated his very first Halloween and Thanksgiving.

Furthermore, during the summer of 2016 while still enrolled in *Penn State*, Sachin joined the summer intensive program at *Nagoya University* in Japan.  Sachin describes his time in Japan as an amazing experience, even now viewing Japan as his second home. When asked what made the experience so special, he refers to the people he met and their way of life, recalling how the locals treated foreigners like one of their own.  In addition to his engineering studies, he also studied Japanese while there and worked to utilize the language even outside of the classroom in hopes to gain a firmer grasp of the language. Two years after returning from Japan and resuming his studies in the U.S., he earned a Bachelor of Science degree in May of 2018 and graduated with a 3.29 GPA.

Prior to coming to *Penn State*, Sachin had limited experience with girls, sex and relationships.  The very topic had been considered taboo in his native country.  In fact, growing up, there had never been any sort of sexual education in school and the subject was never approached by his parents or older brother.  The idea of sex, according to Sachin, was an off-limit topic that was not to be brought up or discussed.  As such, while still in Oman, Sachin had one close female friend – a tenth grade classmate.  She became Sachin's first "girlfriend" and Sachin experienced his first kiss with her, which was the extent of any physical relationship Sachin had with someone prior to entering college. This was also the time when Sachin first watched pornography, which served to be the only form of sexual experience he had prior to coming to the United States.

It was for reasons like these that Sachin's older brother had not wanted him to come to the United States for his college studies.  Instead, he had hoped he would pursue

an education in India, in a more conservative society where he felt Sachin would better fit.  Though he wanted Sachin to be more independent as this would be his first time living on his own, he felt that he would do better in a more reserved society like India, which would not offer Sachin the same freedoms that he would find in the United States. As Nitin had experienced the difference in cultures firsthand when he came to the U.S., he believed that Sachin, who was younger and more sheltered during his teenage years, would go through culture shock and have trouble adjusting from his starkly different upbringing in Oman.  Nitin expressed that from an outsider's perspective, you would be giving a child who lived in  a very strict upbringing all through twelfth grade "all of the freedom in the world," which he felt would be overwhelming for his brother compared to what he was coming from in Oman.

Though Nitin came to the United States himself for his college degree, he first left his home in Oman to attend boarding school in India, which he said prepared him for the independence and living on his own.  He recalls his own experience with culture shock once coming to the U.S. and the blatant differences that he saw between the cultures.  For example, he remembers picking up his iPhone from an Apple store here and recalls seeing a young girl, who appeared to be between 10-12 years old, tell her mother about other kids in her class who had their own cell phones.  Though something seemingly insignificant, Nitin remembers it because of how vastly different Oman and India were; he personally did not have his own cell phone until he went to college and having one at home was seen as a luxury rather than a norm.  Similarly, although Sachin had his first cell phone in high school, it was one used strictly for phone calls, unlike the advanced phones many, if not most, have in the United Stated today, that have internet capabilities.

It wasn't until Sachin came to the United States as a freshman at *Penn State* that he had a phone with that kind of internet access and was more fully exposed to the normal everyday use of technology that was not the norm back home in Oman.

Furthermore, both having a cell phone and using social media apps like those used in the U.S. were both seen as taboo, and rarely used by children growing up in Oman and India. Just as Sachin did not have a more advanced phone until coming to the U.S. for college, he also did not have access to the various social media platforms until college as well. It was for these reasons that Nitin preferred Sachin wait to come to the United States for his master's degree, preferring that he mature more in the more conservative India, where he would be better able to adjust to the independence and social freedoms not previously given to him.

In addition to these nuances, the culture in Oman, where Sachin grew up, was significantly different than the United States. As a result, and as predicted by his brother, once at *Penn State*, it took Sachin a great deal of time to adjust to his new environment. Though he and his parents had visited the U.S. previously to see his brother in Rochester, Sachin had never been to America without his parents or for anything longer than a short visit, nor had he ever lived outside of Oman and India without his family. Though his parents travelled with him to help him move into his dorm, they returned to Oman after one week, and Sachin immediately felt isolated around his peers, recalling feeling "freaked out" by the drastic change and feeling as though he "had nobody" for quite some time.

Unsure of how to approach Americans, both their appearances and social norms were unknown territory for Sachin. For example, he recalls being taken back by mini-

skirts being worn, as well as the seemingly normal fashion trend of baring arms.  By contrast, in Oman, "traditional attire for women, although varying slightly from region to region, is characterized by brightly coloured fabrics and jeweled adornments and consists of a dress over loose-fitting slacks.  A long, flowing scarf known as a liḥāf covers the head." Jill Ann Crystal and J.E. Peterson, *Oman*, *Encyclopedia Britannica*, 2020, https://www.britannica.com/place/Oman/The-early-period.  (accessed August 11, 2020). Additionally, in Oman, "social interaction remains *largely segregated by gender*, however, and most Omani women—particularly those in rural areas—dress in a conservative, time-honoured fashion."  *Id*. (*emphasis added*).

Furthermore, it is interesting to note that, in regard to sexual relations in Oman, there is no age of consent, as all sex outside of marriage is illegal.  This is further indicative of the cultural taboos previously discussed, as the topic of sex was not only avoided by Sachin's family, but was, in law, entirely outlawed absent a marriage.

Not only lacking experience in romantic and social relationships, Sachin also was new to the social scene that is typical to American colleges.  For example, Sachin never tried any type of alcohol before turning twenty-one, as alcohol consumption is illegal for Omani citizens (with some exceptions for establishments like hotels) *id.*, nor did he ever engage in drug use, though it was easily accessible in school.

In addition to the difficulty he faced adjusting, even with his involvement in various clubs, Sachin began suffering from depression as a result of the disconnect he felt from his peers.  Due to the extent of culture shock he was experiencing, it was at first a struggle for Sachin to make new friendships at school, which led to feelings of isolation and depression.  However, there did come a point when Sachin developed a close

relationship with one of his female classmates, which went on to become his first serious romantic relationship.  Sachin first met her when he was a sophomore at *Penn State*, where she was a freshman, through a *Facebook* group for students at the university. After developing a friendship for about three months, the pair officially started dating as boyfriend and girlfriend and went on became quite serious, prompting Sachin to even tell his family and discuss marriage plans.

Though originally from Philadelphia, his girlfriend was also raised with a very religious upbringing. Her parents often prevented her from going out with friends and were even stricter when it came to socializing with male friends. During their relationship, his girlfriend's parents opted to transfer her out of the main campus and move her back home to Philadelphia for financial purposes, which prompted the pair to maintain a strained long-distance relationship.  Further causing a disconnect in their relationship, Sachin did not know if his girlfriend's family was even aware of their relationship, due to her very conservative and religious upbringing.  As such, during the second half of Sachin's senior year in 2018, the relationship began to deteriorate and formally ended after he graduated during the Summer of 2018.  Deeply heartbroken by the relationship's breakdown, after more than two years together, Sachin became withdrawn.  He even sought help from his older brother, asking Nitin to visit him at *Penn State* during the semester.  As Sachin describes it, the relationship was very meaningful to him, both as his first serious love and as what he saw as his future.

As a means of dealing with the stress and depression caused by his deteriorating relationship, Sachin began using various social applications frequently used by other

college students.  The minimum age on most social dating platforms was 18 years old.[4]
Though downloaded for the first time during his earlier years at *Penn State*, he did not
start using the apps until his later years in college, after his girlfriend changed campuses
and their relationship fell apart. These included *Badoo*, which is the application involved
in the incident at bar, as well as *Tinder*, which he downloaded for the first time when he
was twenty-one years old.  Prior to coming to the U.S., Sachin had never used such apps
before, as these types of social media platforms were not just rare but were also
discouraged in his native Oman by the conservative majority.  This point was raised as
recently as 2018 in the *Oman Daily Observer*, a popular and well-known publication
published in the Muscat capital:

> It is happening right here in Oman and many parents see the social media
> *as a challenge to local cultures and traditions*. It is also *seen as a*
> *probable threat to rule and order* as the government looks nervously to its
> rapid expansion. But the quick exchanges of short messages, *viewed as*
> *potentially lethal and even a threat to political and cultural values*, have
> the approval of the 'liberal minded' Omanis to promote free thinking.
> https://www.omanobserver.om/when-social-media-is-a-new-obsession-
> for-the-youth/ (*Emphasis added*).

While the younger generations have tried to embrace the move towards change, the older,
more reserved generations have continued to resist the progress.  Defense believes
understanding this aspect of Omani culture can assist in understanding Sachin's own
inexperience, not simply with social media, but with social interactions in general, as a
large component of current communication trends rests on interactions on these exact
platforms.  As such, Sachin did not become familiar with these platforms until his time at
*Penn State*.  For him, they became a means to cope with the heartache of his unraveling
relationship and his own social anxiety and depression.

---

[4] Popular dating applications, including Tinder, Badoo, Hinge, and Bumble require a minimum age of
18 in order to join, and members must indicate such in order to create their online profile.

**(3) As a Full-Time Student, Mr. Bhaskar Focused on Academics Throughout College, but Quickly Gained Employment Upon Graduating, Demonstrating His Desire and Capability to Work, and to Constructively Contribute in Society.**

Only 24 years-old, Mr. Bhaskar does not have extensive work experience. However, his lack of experience is solely due to Sachin's young age. While enrolled in *Penn State*, most of Sachin's time was dedicated to his studies and the various clubs and organizations that he joined, though he did work during his sophomore year as a teacher's assistant for an Engineering Graphics class.

Additionally, while at *Penn State*, Sachin earned an internship with *Calspan*, an engineering and research group located in Cheektowaga, New York. This was a summer internship in 2017 at the end of his junior year. While interning there, Sachin lived with his older brother Nitin, who also worked at *Calspan* at that time (and still currently does). At that time, Sachin's mother visited for the first time in many years and stayed at Nitin's apartment as well. After his summer internship, Sachin returned to *Penn State* to complete his senior year. Then, upon graduating, Sachin officially became an employee with *Calspan* and started working as an automobile crash test engineer until November 2018.

Though he only had a brief experience in the professional realm due to his young age, Sachin's ability to advance his internship into a full-time employment position, defense believes, is indicative of his high work ethic and ability to successfully contribute to society. Additionally, his focus on academics and success in various school clubs are reliable indicators that Sachin is more than capable and well-equipped to put his

education into practice and become a productive member of the community.  (A copy of

Sachin's resume is included in the Exhibits to this Memorandum).











---

[8] Copies of reports prepared by Drs. Krueger and Rutter are included in the Exhibits to this Memorandum.



.

**(5) Throughout His Time in Custody, Mr. Bhaskar Has Complied with All Conditions, and Has Proactively Participated in Various Programs, as Well as Cultivated a New Passion for Writing, Affirmatively Taking Steps Towards Bettering Himself.**

Currently, Mr. Bhaskar is in custody in *Niagara County Jail* in Lockport, New York.  He has been in custody for just under two years.  Since detained, Sachin has been a model inmate, and is working to better himself as best he can, proactively participating in a number of programs offered by the facility, as well as turning to writing with hopes of becoming an author.  During his time in custody, Sachin has complied with all conditions and has exhibited no behavioral problems.  Furthermore, not only has he exhibited that of which the Court can see as appropriate and responsible behavior while in custody, but, through his actions, he has shown his ability to rehabilitate from this experience.

In an effort to make the most of his time and better himself, Sachin sought to enroll in academic courses offered by the facility, in spite of the fact that he already had earned a bachelor's degree from *Penn State University*.  However, he was not permitted to enroll.  He believes he was denied the opportunity to enroll due to his already having

21

a degree and the program's desire to maintain class spots for inmates who actually

needed a GED.  Nonetheless, Sachin pursued other opportunities.  He began attending

the Bible study groups every Tuesday.  While there, he listened to and discussed

parables read aloud and gained an interest in Christianity, a religion not prevalent in

Oman where he grew up.  Though the classes ended due to the COVID-19 pandemic,

Sachin continues to read the bible as well as materials kept from previous classes.

Additionally, he often reads texts from Hinduism.

Sachin has not only focused his time on religious teachings, but also participated

in different sports, including volleyball and basketball, in order to remain physically

active.  Most notable is Sachin's newfound interest in writing, particularly short stories.

He takes writing very seriously and devotes the majority of his time to it.  Though he

does not have any formal training in writing, as he studied engineering while in college,

Sachin recently developed a love for short stories after reading one in *The New Yorker*

magazine.  As he describes it, he enjoys "the concept of explaining culture, religion, and

personality in a few pages."  He thereafter ordered a weekly subscription and is now an

avid reader of the magazine.  When reading stories and articles, he carefully studies

different writing techniques and conducts research about prominent authors whose

stories he reads.  (A list of books and other materials read by Sachin while in custody is

included in the Exhibits to this Memorandum).  This experience, in turn, has inspired

him to become a writer.  He began drafting his first story around December of 2019.

When speaking to Sachin about his short stories, you can hear the passion and

hope that he holds for this venture.  Once he began writing his first short story, *By the

Shore*, he says the process took months as he was teaching himself how to write, editing

the work on his own and discussing his revisions with his parents during virtual visits. The story is currently in its 25th revision.[9]

Sachin describes the story as semi-autobiographical, focusing on love and using inspiration from his first crush on his high school classmate.  The entire story is based in his home state of Kerala, which he said made the writing process especially challenging since he moved from there when he was still an infant, and therefore had to imagine much of what it was like to live there.  If read closely, one could see the close relation between the story's protagonist and Sachin himself.  As the story progresses and the character is learning about love and himself in the face of a new relationship, the character feels isolated and finds it difficult to seek help from his family and talk to them about what is happening.  When asked about the inspiration for that kind of dynamic, Sachin points to the taboo nature of discussing feelings and love in India, and how it is an unspoken topic in Indian culture.  He even goes as far as writing the character's father as someone who was in an arranged marriage, describing him as someone who only knew of a closed and secluded type of love because of the type of marriage he was in. This storyline very much mirrors that of which Sachin speaks of when describing his own struggles with feeling isolated – for example, a main point of focus when meeting with his mental health counselors was the trauma from his childhood abuse, and the fear of sharing his experience with family and peers.

Thus, not only has story-writing become an outlet for Sachin while in custody, but it has turned into a passion that he continuously works on every day.  His writing is not simply a means of passing time, but has become, in a sense, an awakening for him.

---

[9] A copy of this story is included in the Exhibits to this memorandum.

Following *By the Shore*, Sachin has since written more short stories, two of which, *Avni* and *The Water Tower,* are included in the Exhibits.  Sachin writes these stories under the literary pseudonym Hoshi Nath.  "Hoshi" was chosen out of his love for Japanese culture and means "star in the sky."  "Nath" was taken as a part of his grandfather's name as homage to him.  Through his writing, Sachin has channeled suppressed emotions that he previously had trouble sharing as well as used it to better connect with his Indian culture.  As Sachin describes it, he has always felt some disconnect to Indian culture due to moving at such a young age, which is why he chooses there as the settings for his short stories.  He enjoys learning about, as he says, "the birds that fly there, the smells, the people, their ways of life," so that his readers can believe that the author has actually been to the places in his stories.  Sachin views writing in the same way that he would view a job, devoting the majority of his time to developing and editing his stories, and has hopes that one day his work will be published.  (Sachin's CV, as Hoshi Nath, and some of his short stories are included in the Exhibits to this Memorandum).

Furthermore, not only has his writing become personally meaningful to him, but he's also used it as a means to cope with his incarceration.  Sachin recognizes that the crime for which he stands convicted of is extremely serious and understands the impact that his actions have had on those involved, particularly the impact had on the complainant.  He is incredibly remorseful and has channeled his focus to his writing as a way to better himself and look towards the future.  Sachin understands that he will be incarcerated for a lengthy period of time, but nonetheless wishes to use that time in as healthy of a way as possible, learning and growing from his mistakes.

While Sachin has certainly been a model inmate, it is nonetheless important to address the inherent dangers that he, a 24-year-old, 5'4", 145 lb. male, will potentially face as a convicted sex offender.   There was already one incident where Sachin is currently housed where three or four other inmates attempted to break into Sachin's cell. Fortunately, Sachin was not in his cell at the time, but a close friend of his was nearby and intervened.  Sachin says this particular friend had become like a brother to him as he was the only other individual of Indian background.  As a result of the fight, his friend was injured.  Though Sachin has developed friendships with some inmates, he believes that he was targeted due to the nature of his case and the stigma that comes with sexual offense convictions.

This problem of such danger was addressed by Congress in 2003 when it enacted the *Prison Rape Elimination Act* (PREA), which focused on the problem of predatory sexual abuse of people in custody of U.S. correctional facilities.  *See*, 108th Congress Public Law 108-79.  Furthermore, a 2013 Bureau of Justice Statistics discussed the prevalence of sexual violence among inmates, estimating that, in 2011-2012, 4.0% of state and federal prison inmates reported experiencing one or more incidents of sexual victimization by another inmate or facility staff.  Allen J. Beck, Ph.D., Marcus Berzofsky, Dr.P.H., Rachel Caspar, and Christopher Krebs, Ph.D., *Sexual Victimization in Prisons and Jails Reported by Inmates*, 2011-12, p. 6, May 2013, NCJ 241399, available *at https://www.bjs.gov/content/pub/pdf/svpjri1112.pdf* (accessed June 17, 2020).

In addition to the already present danger of inmate-to-inmate, or even staff-to-inmate victimization, it is important to consider the increased risk that Mr. Bhaskar will face as a result of both his conviction and his mental health conditions.

> Among state and federal prison inmates, an estimated 6.3% of those identified with serious psychological distress reported that they were sexually victimized by another inmate. In comparison, among prisoners with no indication of mental illness, 0.7% reported being victimized by another inmate … For each of the measured demographic subgroups, inmates with serious psychological distress reported higher rates of inmate-on-inmate sexual victimization than inmates without mental health problems.

*Id*. at 7.  For example, "inmates identified as having anxiety-mood disorders reported higher rates of sexual victimization than inmates who did not report a mental health problem.  *Id*. at 27. Furthermore, "inmates held for a violent sexual offense reported higher rates of inmate-on- inmate sexual victimization than inmates held for other offenses." *Id*. at 19.  Not only do inmates convicted of violent sexual offenses report a higher rate of sexual victimization than inmates convicted of other offenses, but inmates with a longer sentence length also report a higher rate of victimization.  *Id*.

Consequently, inmates with sexual offense convictions and mental health issues who are more likely to experience victimization by other inmates are often placed into protective custody. However, this typically means that the inmate will be held in isolation for majority of their day, which further takes a significant toll on their mental health. Such isolation can result in increased anxiety, depression, anger, cognitive disturbances, perceptual distortions, obsessive thoughts, paranoia, and psychosis. J.L. Metzner, M.D. and Fellner, Jamie, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, *J. Am. Acad. Psychiatry Law* 38: 104-8, 2010, p. 104; available at *http://jaapl.org/content/jaapl/38/1/104.full.pdf* (accessed June 17, 2020).  Thus, for an

individual like Mr. Bhaskar, who has a reported history and diagnosis of mental health conditions and is convicted of a sexual offense against a minor, the use of isolation for the purpose of protection will very likely exasperate his already existing conditions. Thus, Defense believes it is of the utmost importance for the Court to consider these factors when considering an appropriate sentence.

**2.      The Nature and Circumstances of the Offense [18 U.S.C. §3553 (a)(1)]**

As noted above, Sachin graduated from *Penn State University* during the Spring of 2018.  Thereafter, he moved to the Buffalo area where his brother resides and due to his being hired to work full-time at *Calspan*.

Being new to the area and still dealing with his depression and the demise of his relationship with his girlfriend, Mr. Bhaskar used the *Badoo* app to socialize and date adult single women.  According to the *Badoo* privacy policy, its users must be at least 18 years of age.  Mr. Bhaskar met the complainant through *Badoo*.[10]  After seeing her profile, on August 11, 2018, Sachin sent her a greeting, stating:

> Hey [smile emoji] u live close to Buffalo right? what do u do here? lm Sachin. i just found u through Badoo and im interested in going on a date with u this week i recently moved to Buffalo for work i love travel soccer photography and hiking too and recently started rock climbing too. i love cooking so bonus points haha. i have been to 19 countries what kinda guy and relationship r u interested in?

The complainant responded indicating she was not nineteen and that she was instead fifteen years old.  During the course of the day, they exchanged more than 600 messages with each other and eventually agreed to meet with each other later that evening.  At

---

[10] Notwithstanding *Badoo*'s policy, the complainant had posted a profile and listed her age as nineteen.  (Copies of *Badoo*'s privacy police and the complainant's contact page are included in the Exhibits to this Memorandum).  A review of the complainant's phone revealed that, in addition to Sachin, the complainant had prior conversations of a sexual nature with other adult males.  During the defense's investigation, the complainant's mother explained that the complainant appeared older than her given age.

times, the conversation involved "dating" matters such as whether they would have a meal, watch a movie, and what outfit the complainant would wear.  In addition, at times, the conversation became sexual where, for instance, various sexual positions were discussed.

Eventually, they arranged for Mr. Bhaskar to pick her up at her home and go back to his apartment.  Mr. Bhaskar picked her up at approximately 10:20 p.m.  Thereafter, they went to his apartment and were there for approximately one and one-half hours.  During this period, they watched a movie and engaged in sexual conduct.  While there, Mr. Bhaskar did not give her drugs or alcohol, nor did he use physical force to engage in the sexual conduct.  Later that evening, he dropped her off at her house.  It was not until after he was arrested in this case that Mr. Bhaskar learned the complainant was not 15 years-old, but in fact was 11 years-old.

**3.      Consideration of the Advisory Sentencing Guidelines
          [18 U.S.C. §3553 (a)(4)(A)]**

18 U.S.C. §§3553 (a)(4)(A) requires a sentencing court to take the advisory sentencing guidelines into consideration.  We do not object to the accuracy of the guideline calculations as set forth in the PSR.  However, we urge the Court to give consideration to the duplicative nature of the underlying circumstances of some of the advisory Sentencing Guideline enhancements.

Mr. Bhaskar received a two-level enhancement, under U.S.S.G. §2G1.3(b)(3)(A), for his use of a computer in this offense (PSR ¶31)  This enhancement applies as Sachin met the complainant over the internet through an adult dating website. Realistically, in today's age, the interstate commerce element of the federal offense of coercion and enticement of a minor to engage in sexual activity by mail or means of interstate

commerce (18 U.S.C. §2422(b)) primarily involves the use of a computer, smartphone or tablet or other device.  Long gone are the days where this offense was committed through the mail or by rotary telephone.  As such, although applicable, this enhancement is arguably duplicative as the use of a computer is, in essence, part of the interstate commerce element of the offense which is accounted for within the offense's U.S.S.G. base offense level.

Mr. Bhaskar further received an eight-level enhancement, under U.S.S.G. §2G1.3(b)(4)(A), for the offense involving a minor who has not yet attained the age of 12 years.  (PSR ¶32).  Although this enhancement applies, we urge the Court to give consideration to the circumstance that, when Sachin initially sent a greeting to the complainant on the *Badoo* app, he believed he was contacting a nineteen year-old girl based on the age she posted on her profile page.  As such, when he initially contacted her, he was not seeking to date a girl who was less than twelve years old.  While the complainant eventually indicated she was fifteen years of age, at no time during their chats, nor when they met, did Sachin believe she was less than twelve years old.  In fact, he did not learn her age until after he was apprehended.   Defense recognizes that lack of knowledge of the age of the minor is not a defense to the application of the enhancement.  However, this circumstance does give context to the nature of the offense.  This is not a case where a defendant specifically sought to have sexual relations with a girl who was less than 12 years-old.  Yet this eight-level Guideline enhancement does not provide a distinction between defendants who, like Sachin, do not actively seek to have sexual relations with minors who are less than 12 years-old and predatory defendants who actively seek to have sexual relations with minors who are less than 12 years-old.

Similarly, Sachin received a five-level enhancement, under U.S.S.G. §4B1.5(b)(1) due to his previously engaging in sexual conduct with a 15 year-old girl in Pennsylvania. (PSR ¶38). When Sachin met this girl, again through an adult dating website, he was unaware that the girl was under the age of 18 as the site mandated any users be 18 or over. Similar to the §2G1.3(b)(4)(A), this five-level Guideline enhancement does not provide a distinction between defendants like Mr. Bhaskar who believe they are lawfully engaging in consensual sexual conduct and a predatory defendant who knowingly seeks to engage in sexual conduct with minors.[11]

Collectively, these enhancements add fifteen levels toward the calculation of Sachin's Total Offense Level ("TOL"). As a point of reference – for purposes of considering a sentencing variance – if these enhancements did not apply, then Sachin's TOL would have been 29. Based upon a Criminal History Category of I, a TOL of 29 corresponds to an advisory Sentencing Guideline range of 87 to 108 months. Given the mandatory minimum in the case at bar is 120 months, sentencing Mr. Bhaskar to said minimum would therefore be an appropriate sentence.

**4.    The Need to Avoid an Unwarranted Sentence Disparity
       [18 U.S.C. §3553 (a)(6)]**

18 U.S.C. §3553(a)(6) requires a sentencing court to determine whether a sentence will result in an unfair disparity between defendants with similar conduct and similar records.

---

[11] Though charged as a forcible rape by a stranger, further investigation revealed that the complainant, who was active on numerous social media and adult dating sites, had in fact met Mr. Bhaskar on an adult dating site. Phone records revealed that the two had been in constant touch with each other via texts/calls for several weeks leading up to and including the day of their sexual encounter. The pair met and, defense submits, that the sexual encounter was consensual. It was not until after Sachin's arrest on the above case that he learned that the girl was 15 years and 3 months old, approximately 9 months shy of Pennsylvania's age of consent.

As noted in the PSR, Sachin's statutory mandatory minimum sentence is 120 months' imprisonment and his advisory Sentencing Guideline range is life imprisonment. We submit that imposition of a sentence above the statutory mandatory minimum will result in an unfair sentencing disparity with defendants who have similar records and engaged in similar conduct.

Set forth below is a table summarizing eight recent sentences for defendants, all prosecuted in this District, who received sentences of 120 months or less. Like Sachin, these defendants had no prior criminal history and were in U.S.S.G. Criminal History Category I. Further, like Sachin, each defendant engaged in conduct which constituted enticement, or attempted enticement, of a minor to engage in sexual activity in violation of 18 U.S.C. §2422(b). Each defendant was convicted of enticement or, with consent of the Government, allowed to plead guilty to, in essence, a lesser offense of possession of child pornography in violation of 18 U.S.C. §2552A.

For many of these defendants, their offense conduct was far more extensive than Sachin's offense conduct. Some engaged in prolonged repeated sexual acts with a minor (*Alvarado*). Some were parents or custodians who lived with the minor and, therefore, abused their positions of trust (*Powell, Mason, Alvarado*), whereas Sachin met the complainant on an adult dating website. Some gave drugs and alcohol to the minor (*Flores-Torres*) whereas Sachin did not. Further, unlike Sachin, some included possession and production of child pornography indicating the defendants were actively looking for minor children (*Powell, Flores-Torres, Alvarado,* and *Wilke*). Additional information about these, and other, cases is as follows:

| Defendant | Charge | Sent. | USSG | Offense Conduct |
|---|---|---|---|---|
| Powell<br>16 cr 6074<br>(EAW) | 2422 | 120 mos | Level 31<br>CHC I<br>120-135 mos | Defendant, 48, had oral sex with a girl under the age of 14 who was in his custody and care.  He had sexual chats with her, sent sexually explicit photos to her and possessed child pornography. |
| Flores-Torres<br>16 cr 243<br>(LJV) | 2252A | 120 mos | Level 35<br>CHC I<br>168-210 mos | Defendant, 25, repeatedly performed oral sex on a 14-year-old boy to whom he gave marijuana and alcohol.  He also created images of himself placing the hand of a 4-year-old girl on his penis and masturbating.  He was the head of an online chat group that traded child pornography including images of minors less than 12 years old depicting sadism, masochism and violence. |
| Chase<br>17 cr 101<br>(RJA) | 2252A | 60 mos | Level 27<br>CHC I<br>70-87 mos | Defendant, 49, engaged in a sexually explicit online conversation discussing performing sex acts with a UC posing as 15-year-old girl.  He arranged to meet her in person to engage in sex.  He traveled to a parking lot to meet the girl for the purpose of having intercourse with her.  When he was arrested in the parking lot, he was in possession of sexual lubricant, condoms and a sex toy. |
| Alvarado<br>16 cr 6005<br>(CJS) | 2252A | 72 mos | Level 31<br>CHC I<br>108-135 mos | Defendant, 29, had repeated sexual contact with a girl over a two year period (while she was ages 13 through 15) who lived in his home.  The contact included touching, intercourse and oral sex.  He coerced and threatened her to take sexually explicit pictures of herself and send them to him. |

| Defendant | Charge | Sent. | USSG | Offense Conduct |
|---|---|---|---|---|
| Mason<br>17 cr 6168<br>(FPG) | 2252A | 84 mos | Level 33<br>CHC I<br>135-168 mos | Defendant, 37, was the boyfriend of the mother of 13-year-old girl.  The mother and daughter lived with defendant.  He badgered and attempted to "groom" the daughter (via sexually explicit online messages) to send him nude photos of herself and to perform sex acts with him. |
| Wilke<br>09 cr 6099<br>(CJS) | 2422<br>2252A | 120 mos | Level 34<br>CHC I<br>151-188 mos | Defendant, 46, discussed engaging in sexual acts in online chats with a UC posing as a 15-year-old boy.  Defendant solicited the UC to meet in a park for purposes of having sex and was arrested when he went to meet the UC.  Following arrest, child pornography was recovered from defendant's computer.  Defendant was convicted following a jury trial.  He testified falsely at trial and his USSG calculation included an enhancement for obstruction of justice. |
| Taouzinet<br>16 cr 6021<br>(FPG) | 2252A | 60 mos | Level 35<br>CHC I<br>168-210 mos | Defendant engaged in sexually explicit conversations, and solicited sexual photographs from a 13-year-old girl via text message. Thereafter, he met the girl and engaged in sexual intercourse with her. |

As a further point of reference, set forth below are summaries of five cases, prosecuted in this District, where the offenders are outright sexual predators.  Unlike Sachin, among other acts, these offenders repeatedly engaged in sexual conduct with their victims and forced their victims to engage in sexual conduct under threat of physical violence (*Miller, Jones*); engaged in sexual conduct with, and created child pornography of, his 3 year old son (*Sylvester*); engaged in sexual conduct with the 13 year old daughter

of a longtime family friend, convinced the child to provide sexually explicit photos and

engaged in the same grooming behavior with a second 13 year old.  (*Junot III*); as a Boy

Scout troop leader, engaged in sexual conduct with his scouts and possessed child

pornography (*Huzinec*); and, was already a level III registered sex offender who engaged

in sexual conduct with a mentally disabled minor and then threatened to kill her family and

schoolmates if she reported him to authorities (*Jones*).

Additional information about these cases is follows:

| Defendant | Charge | Sent. | USSG | Offense Conduct |
|---|---|---|---|---|
| Miller 13 cr 6036 (DGL) | 2422(b) | 168 mos | Level 37 CHC VI 360-life | Defendant, 53, used threats and bribes to coerce a 12-year-old girl, who he knew her entire life, to make sexually explicit videos.  Defendant also took sexually explicit pictures of another 12-year-old girl in his bedroom. |
| Sylvester 19 cr 6029 (FPG) | 2422(b) | 144 mos | Level 39 CHC I 262-327 mos | Defendant, 24, created child pornography involving him and his 3-year-old son and his son with another adult.  He distributed the images over the internet.  He was a member of an online chat group dedicated to discussing child exploitation and trading child pornography. He met a UC in the chat group and discussed having sex with the UC's 11-year-old daughter. He sent child pornography to the UC which included a prepubescent girl performing oral sex on an adult male.  He offered to let the UC have sex with his 3-year-old son in exchange for the UC letting him have sex with the UC's daughter. |

| Defendant | Charge | Sent. | USSG | Offense Conduct |
|---|---|---|---|---|
| Junot III<br>13 cr 6137<br>(FPG) | 2422(b) | 144 mos | Level 35<br>CHC I<br>168-210 mos | Defendant, 37, engaged in sexual contact with a 13-year-old girl by touching her breast and vagina and attempting to have her perform oral sex. He regularly socialized with a parent of the victim at a bowling alley and had known the girl for several years. He sent sexually explicit photographs of himself to the girl. He directed her to masturbate while he was chatting with her and induced her to send him sexually explicit photos of herself. He undertook similar actions with another 13-year-old girl (whose parents also socialized with him). He engaged in "grooming" chats with her in an effort to engage in sexual conduct with her and to obtain sexually explicit images of her. |
| Huzinec<br>15 cr 28<br>(LJV) | 2252A | 168 mos | Level 37<br>CHC I<br>210 to 240 mos | Defendant, 26, was a Boy Scout troop leader and worked for Child and Family Services. He engaged in sexual conduct with two minor scouts in his troop. He also took sexually explicit photos of them and shared the images online. In addition, he enticed a 15-year-old scout, with autism, to send him nude photos by pretending to be a 15-year-old girl who was interested in him. He possessed child pornography which depicted very young children including infants. |

| Defendant | Charge | Sent. | USSG | Offense Conduct |
|---|---|---|---|---|
| Jones<br>14 cr 6179<br>(CJS) | 2422(b) | 151 mos | Level 31<br>CHC II<br>121-151 mos | Defendant, 32, was a Level III sex offender at the time of the offense based upon a prior rape conviction.  He repeatedly had sex with a mentally disabled minor who he met online.  He threatened to kill her and her family if she told anyone about their sexual encounters.  He also threatened to shoot up her school. |

Defense submits that the conduct of these defendants was far more egregious than Sachin's offense conduct.  These defendants were sentenced to terms of imprisonment - ranging from 144 to 168 months – which are only two to four years greater than the ten year sentence we request be imposed upon Sachin.  Against the backdrop of these cases, we submit that imposition of  a sentence greater than 120 months will result in an unwarranted disparity under §3553(a)(6).

**5.      The Need to Provide For Educational or Vocational Training
        [18 U.S.C. §3553 (a)(2)(D)]**

18 U.S.C. §3553(a)(2)(D) requires the Court to consider the need for continued incarceration for vocational or educational purposes.

In 2018, Sachin was awarded a Bachelor of Science degree, in Mechanical Engineering, from *Penn State University*.  During the Summer of 2017, he worked as an intern at *Calspan*, an engineering firm in Buffalo, as a paid intern.  Following his graduation, he was hired by *Calspan* to work, full-time, as a crash testing engineer.  He continued working there until he was arrested in this case.

36

In addition to working at *Calspan*, while he was an undergraduate student at *Penn State*, he worked, part-time as a teaching assistant.

For the Court's reference, a copy of Sachin's resume is included as an Exhibit to this Memorandum.

Based upon the foregoing, we submit there is no apparent need to incarcerate Sachin for a period beyond the ten-year mandatory minimum term for purposes of continued educational or vocational training.

**6.    Due to Sachin Being an Indian Citizen, He Will Spend Additional Time in Prison**

Sachin is not a United States citizen.  Unlike U.S. citizens, as he approaches the end of his prison term, he will not be eligible to spend the final portion of his sentence in Residential Reentry Center.  As such, he will end up serving the full term of his sentence, behind bars, in prison.  Moreover, despite an expectation that he will have a low-level security classification, he will not be eligible for designation to a prison camp as non-citizens are not designated to prison camps.

In addition, even after Sachin serves out his full sentence, his time behind bars will not be over.  Following completion of his sentence, he will be transferred to ICE custody.  Currently, due to the enormous backlog of immigration removal cases, it can take months or even more than a year for a case to be processed. For example, the average wait time for a removal case -- for an Indian national, detained and with a hearing location in Buffalo -- is 499 days.  *See Immigration Court Backlog Tool*, online access at:  https://trac.syr.edu/phptools/immigration/court_backlog/

**7.      The Need to Protect the Public [18 U.S.C. §3553 (a)(2)(C)]**

According to a June 2012 study by the Pew Center on the States, entitled *Time Served – The High Cost, Low Return of Longer Prison Terms* (hereinafter "*Pew Report*), which analyzed state data reported to the federal government between 1990 and 2009, with respect to many offenders, there was no correlation between the longer imprisonment and improved public safety.  As the *Pew Report* concluded:

> [d]espite the strong pattern of increasing length of stay, the relationship between time served in prison and public safety has proven to be complicated.  For a substantial number of offenders, there is little or no evidence that keeping them locked up longer prevents additional crime.

*Id*. at 4.  The offense for which Sachin is convicted is uncharacteristic when viewed in the context of his entire life and a term of imprisonment beyond the mandatory minimum is not needed to protect the public from further crimes of Mr. Bhaskar.  In addition, his demonstrated work ethic, strong familial ties, and career potential all lead to a reasonable conclusion that Mr. Bhaskar will not break the law in the future.

Furthermore, upon meeting with Dr. Richard Krueger, who has dedicated the last 25 years to working for the State of New York Office of Mental Health, performing risk assessments on individuals who have committed sexual offenses and overseeing a personal practice, Mr. Bhaskar underwent a number of exams himself.  Based on these exams, Dr. Krueger found that Mr. Bhaskar "could easily and safely be managed in the community under the usual conditions of supervision of sexual offenders by Federal Probation," basing his conclusion on the various exams conducted, as well as the fact that Mr. Bhaskar "has a good education and likelihood for employment in the

community and a supportive family," all of which are "associated with a decreased in risk of recidivism."  Krueger Report, p. 10.

Dr. Krueger's report provides a thorough analysis of Mr. Bhaskar's results, as well as provides insight into his personal background.  For example, Mr. Bhaskar received a score of 0 out of 43 on the "Level of Service/Case Management Inventory," showing that "he is in the 0.7[th] percentile in terms of risk, meaning that 99.3% of individuals who are offenders who are now in the community had a higher risk of re-offense and greater need for services than Mr. Bhaskar does.  *Id*. at 9.  Dr. Krueger also rated his risk of sexual violence low, as well as found him to be in the "low risk category" based on the SONAR, which rates an individual's risk assessment.  *Id*. at 9.

Additionally, as previously mentioned, Mr. Bhaskar also underwent a psychological evaluation by Dr. Michael Rutter, a licensed psychologist and clinical member of the Association for the Treatment of Sexual Abusers.  Dr. Rutter evaluated Mr. Bhaskar over the course of two days to specifically determine whether Mr. Bhaskar is a danger to the community based on a number of factors, including a clinical interview, mental status examination, the administration of two psychological tests, and the use of two actuarial risk assessment tools.  Rutter Report, p.1.  Similar to Dr. Krueger, Dr. Rutter's evaluation determined that Mr. Bhaskar has a "low risk for sexual recidivism" and is "not a danger to the community," and further added his belief that Mr. Bhaskar is "an appropriate candidate for pretrial release that stipulates home confinement and electronic monitoring,"  *Id*. at 5.  Accordingly, it is reasonable to surmise that Mr. Bhaskar presents a low risk to the public and the need to protect the public is more than sufficiently met if the  minimum  mandatory  sentence  is imposed.

**8.    The Need to Afford Adequate Deterrence [18 U.S.C. §3553 (a)(2)(B)]**

Specific and general deterrence is a specific component of most sentences, although it provides no quantifiable reduction in crime.  Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).

General deterrence is based, in part, on creating or enhancing a particular individual's sentence based on the prospect of influencing some unknown future wrongdoer who has not committed, or perhaps even contemplated, a crime.  However, a person should receive the sentence *they* deserve, without significant consideration for what some other future, unknown person may deserve.  According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).  If considering the benefits of shorter prison sentences, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society.   V. Wright, *Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* (2010), p. 7,  http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf. Conversely, when prisoners serve longer sentences, they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.  *Id.*

In imposing the least sentence sufficient to account for the need to protect the public from further crimes, this Court should consider the low risk of recidivism presented by Mr. Bhaskar's history and characteristics. As indicated in the Presentence Investigation Report, Mr. Bhaskar has fully accepted responsibility for his crime and has admitted guilt. In considering his admission, as well as mitigating factors surrounding Mr. Bhaskar, it is reasonable to conclude that he does not fit the characteristics of someone who will return to criminal behavior once released. For Mr. Bhaskar, a minimum sentence of 10 years would specifically deter him from any further criminal conduct. The specific deterrence afforded by a prison term of any length is virtually guaranteed to dissuade him from further criminal activity. Thus, this Court, after considering the need to deter Mr. Bhaskar through specific deterrence and other similarly situated individuals through general deterrence, should find that a sentence of 120 months is sufficient, but not greater than necessary based on the need to provide adequate deterrence.

9.    **The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment [18 U.S.C. §3553 (a)(2)(A)]**

Section 3553(a)(2)(A) requires the judge to consider "the need for the sentence imposed…  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  A sentence that is excessive in light of the seriousness of the offense promotes disrespect for law and provides unjust punishment. The purposes set forth in §3553(a)(2)(A) are generally referred to, collectively, as "retribution," which has been defined as follows:

> First, retributive, or "just deserts," theory considers only the defendant's past actions, not his or her probable future conduct or the effect that the punishment might have on crime rates or otherwise. Second, retribution

41

examines the actor's degree of blameworthiness for his or her past actions, focusing on the offense being sentenced . . . Third, the degree of blameworthiness of an offense is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity.

Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005).  Based on these factors, the Court must balance the seriousness of the offense with the need to provide just punishment and promote respect for the law.

Mr. Bhaskar's degree of blameworthiness is mitigated by the fact that he:

1. Entered a plea to the charge in a timely manner;
2. Is remorseful for his criminal behavior; and
3. Has a history of mental health concerns that very likely contributed to the instant offense.

Judges must consider *all* of "the kinds of sentences available" by statute, § 3553(a)(3), even if the "kinds of sentence . . .  established [by] the guidelines" permit or encourage only prison.  *See, Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 602 & n.11 (2007).   The court, in determining the length of the term of imprisonment, shall consider the factors set forth in section 3553(a) to  the  extent that they are applicable, recognizing that *imprisonment is not an appropriate means of promoting correction and rehabilitation*.   18 U.S.C. § 3582(a) (*emphasis added*).

The true hope of sentencing is to adequately punish an individual, while maintaining or enhancing their ability to be a law-abiding citizen, maintain employment, maintain family ties, avoid recidivism, and obtain proper treatment.  Thus,

a sentence of 10 years, the mandatory minimum, is adequate punishment for Mr. Bhaskar, a 24-year-old male with no prior criminal convictions.

In addition, Sachin not only faces a significantly long sentence if even the mandatory minimum is imposed, but he faces even further punishment upon his release, as he is not a U.S. citizen and will very likely face deportation upon his release. While the issue of deportation is of no control to this Court, Defense believes that this collateral consequence should be taken into consideration when determining what is necessary, but not an excessive sentence for Mr. Bhaskar.

At this time, Mr. Bhaskar has been detained under the supervision of pretrial services since November of 2018. This experience, combined with the length of time he has already been detained for, has been sufficient to deter him from committing further crimes. Thus, incarcerating Mr. Bhaskar for any longer than 10 years will do nothing to promote respect for the law, provide just punishment or account for the serious nature of the offense

**10.    The Kinds of Sentences Available [18 U.S.C. §3553 (a)(3)]**

On January 12, 2005, the Supreme Court severed and excised the provisions of the Guidelines that made them mandatory, thereby "mak[ing] the Guidelines effectively advisory." *Booker*, 125 S. Ct. at 757. Instead of being bound by the Sentencing Guidelines, the Sentencing Reform Act, as revised by *Booker*, requires a sentencing court to consider Guideline ranges, but permits the court to tailor the sentence in light of other statutory concerns as well, see §3553(a). *Booker*, 125 S. Ct. at 757. Thus, under *Booker*, sentencing courts must treat the guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. §3553(a).

Henceforth, in consideration of these factors, the mandatory minimum of 120 months is the most appropriate solution to best serve the interests of justice in the case at bar.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Bhaskar respectfully requests that this Court sentence him to 120 months, the mandatory minimum for the conviction at hand.  Mr. Bhaskar submits that such a sentence is sufficient, but not greater than necessary, to meet the statutory goals of sentencing.

Dated: September 4, 2020                    Respectfully submitted,


JULIE RENDELMAN, ESQ.
Law Offices of Julie Rendelman, LLC
Attorney for the Defendant
535 Fifth Avenue, 25th Floor
New York, NY 10017
212-951-1232

JEFFREY PITTELL
*Maher & Pittell, LLP*
42-40 Bell Blvd., Ste 302
Bayside, NY  11361
516 829 2299
516 977 3003 fax
917 715 8897 cell